United States District Court
Southern District of Texas
**ENTERED**
February 28, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Lexon Insurance Company, Inc., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action H-21-990 |
| | § | |
| Chevron U.S.A. Inc., Sojitz Energy | § | |
| Venture, Inc., BP America | § | |
| Production Company, Roger D. | § | |
| Linder, and General Miles Biggs | § | |
| Jr., | § | |
| *Defendants.* | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Lexon Insurance Company, Inc. (Lexon) filed this lawsuit against Defendants Chevron U.S.A. Inc. (Chevron), Sojitz Energy Venture, Inc. (Sojitz), BP America Production Company (BP), Roger D. Linder (Mr. Linder), and General Miles Biggs Jr. (Mr. Biggs) (collectively, Defendants). ECF No. 1. Pending before the court are Motions for Summary Judgment filed by Defendants' Chevron, BP, and Sojitz (collectively, Corporate Defendants),[1] ECF Nos. 75, 77, 79, and Plaintiff Lexon's Motion for Summary Judgment Against the Corporate Defendants and Partial Summary Judgment Against the Individual Defendants, ECF No. 81. On June 27, 2023, the District Judge referred the case to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Federal Rule of Civil Procedure 72. ECF No. 109. The court recommends that Lexon's Motion for Summary Judgment Against the Corporate Defendants, ECF No. 81, be **DENIED**, that

---

[1] Corporate Defendants' Motions for Summary Judgment, ECF Nos. 75, 77, 79, are nearly identical. Chevron and BP filed a joint response and reply. ECF Nos. 91, 96. Thus, the court refers collectively to the Corporate Defendants' arguments except as otherwise indicated.

Lexon's Partial Motion for Summary Judgment Against the Individual Defendants, ECF No. 81, be **GRANTED**, and that the Corporate Defendants' Motions for Summary Judgment, ECF Nos. 75, 77, 79, be **GRANTED**.

## I. Background and Facts

Lexon filed this action on March 26, 2021. ECF No. 1. Lexon asserts claims for declaratory judgment (Count I); subrogation (Count II); contribution (Count III); equitable subordination and unjust enrichment (Count IV); and breach of contract (Count V). *Id.* ¶¶ 89–122.

On July 1, 1983, the United States issued oil and gas Lease No. OCS-G 5283 (the Lease) under the Outer Continental Shelf Lands Act (OCSLA) to Amoco Production Company (Amoco). ECF No. 74 ¶ 2. Outer Continental Shelf leases and rights-of-way are managed by the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE). ECF No. 1 ¶ 3. On July 1, 1987, Amoco assigned 100% of its record title interest in the Lease to Tenneco Oil Company (Tenneco). ECF No. 74 ¶ 6. By merger, Amoco became BP. *Id.* ¶ 7. On September 30, 1988, Tenneco assigned its record title interest in the Lease to TOC-Gulf of Mexico Inc. (TOC). *Id.* ¶ 8. On December 31, 1988, TOC merged with Chevron. *Id.* ¶ 9. Via the merger, Chevron acquired 100% of the record title interest in the Lease. *Id.* ¶¶ 9–10. In 1989, Chevron was granted Right-of-Way No. OCS-G 11685 (ROW), which allowed for a pipeline associated with the Lease to transmit hydrocarbons to a third-party line. *Id.* ¶11.

On January 1, 2005, Chevron, then the sole record title interest owner of the Lease and sole holder of the ROW, entered into a Purchase and Sale Agreement (PSA) with Linder Oil Company (Linder Oil). ECF No. 74 ¶ 15. Pursuant to the PSA, Chevron sold and assigned its interest in the Lease and ROW to

2

Linder Oil, and Linder Oil conveyed to Chevron all of the operating rights in the Lease as to those depths greater than 13,564 feet (Deep Rights). *Id.* ¶ 16. Also pursuant to the PSA, Linder Oil agreed to assume all responsibility for Chevron's decommissioning obligations, and to indemnify Chevron for any future liability, including for decommissioning obligations. ECF No. 75-10 at 6–7.

On January 1, 2005, Linder Oil assigned 50% of its record title interest in the Lease to Reserves Management, L.C. (Reserves) and the other 50% of its record title interest in the Lease to Destin Resources, LLC (Destin), but Linder Oil remained the holder of the ROW. ECF No. 74 ¶ 19. Reserves and Destin then designated (i) Linder Oil as the designated operator for the entire Lease, limited to all depths above the Deep Rights (the Shallow Rights) and (ii) Chevron as the designated operator for the Lease as to the Deep Rights. *Id.* ¶ 20. On July 1, 2006, Reserves and Destin conveyed 25% record title interest in the Lease to Sojitz. *Id.* ¶ 22. On April 1, 2015, Sojitz assigned 50% record title interest in the Lease back to Reserves and Destin equally. *Id.* ¶ 28.

As a result of the foregoing transactions, as of April 2015:

- Reserve held 50% record title interest in the Lease;
- Destin held 50% record title interest in the Lease;
- Chevron remained the operating rights owner and designated operator for the Lease as to the Deep Rights;[2]
- Linder Oil was the designated operator as to the Shallow Rights; and
- Linder Oil remained the holder of the ROW.

ECF No. 1 ¶¶ 55–59.

After Sojitz conveyed its rights in the Lease and the ROW, BOEM required Linder Oil to provide financial assurance in the form of performance bonds to secure its Lease obligations,

---

[2] The Deep Rights are not at issue in this case.

3

including decommissioning, to the United States. ECF No. 74 ¶ 36. In March 2016, Lexon, acting as surety for its principal, Linder Oil, issued eight Outer Continental Shelf (OCS) Mineral Lessee's or Operator's Supplemental Bonds (collectively, the Bonds) with an aggregate penal sum of $11,163,300 in favor of the United States, acting through BOEM, as obligee. *Id.* ¶ 37. The Bonds secured Linder Oil's Lease and ROW obligations, including decommissioning obligations. *Id.* ¶ at 38. In addition, Lexon claims that Mr. Linder and Mr. Biggs (collectively, the Individual Indemnitors) agreed to fully indemnify Lexon from "loss incurred as a consequence of having executed the Bonds" via General Agreement of Indemnity (Indemnity Agreement). *Id.* ¶ 39. The Individual Indemnitors dispute that they are liable to Lexon under the Indemnity Agreement. *Id.*

In 2017, Linder Oil, Reserves, and Destin filed for bankruptcy. ECF No. 74 ¶¶ 44–46. The Lease terminated on June 6, 2018, and the ROW expired in September 2018. *Id.* ¶¶ 58–59. When the Lease terminated and the ROW expired, Reserves and Destin "each held 50% record title interest in the Lease[,] Chevron held the operating right as to the Deep Rights in the lease[,]" and Linder Oil was the holder of the ROW. *Id.* ¶ 60. On June 2, 2020, BOEM notified the Chapter 7 Trustee that Linder Oil did not complete its decommissioning obligations under the Lease and ROW, and BOEM therefore ordered forfeiture of the Bonds by Lexon. *Id.* ¶ 63.

On February 11, 2021, Lexon paid the sum of the Bonds to BOEM. ECF No. 74 ¶ 66. BOEM and BSEE entered into a Decommissioning Agreement, effective December 3, 2021, with Sojitz and Chevron pursuant to which BOEM would provide the forfeited Bonds funds to Sojitz, and Sojitz would conduct the required decommissioning. *Id.* ¶ 67. The United States transferred $11,163,300, representing the forfeited penal sum of the Bonds, to

4

Sojitz, and Sojitz spent $13,641,844.68, including the $11,163,300 from the Bonds, to complete the decommissioning obligations. *Id.* ¶¶ 72–74.

## II. Legal Standards

### A. Summary Judgment

"Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting FED. R. CIV. P. 56(a)). No genuine issue of material fact exists if a rational jury could not find for the nonmoving party based on the complete record. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, "[t]he movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If this burden is met, the nonmovant must then "go beyond the pleadings," using competent summary judgment evidence to cite "specific facts" showing a genuine issue for trial. *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)).

The court views all evidence and reasonable inferences in the light most favorable to the opposing party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The court, however, does not have a duty "to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) ("Rather, the party opposing

the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports [the] claim.").

"[C]onclusory allegations, unsubstantiated assertions, [and] 'only a scintilla of evidence'" are not enough to defeat a properly supported motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). Nor is the "mere existence of a scintilla of evidence" sufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## B. OCSLA

This court's federal jurisdiction is premised on OCSLA. 43 U.S.C. § 1333. OCSLA "extends federal law to the subsoil and seabed of the Outer Continental Shelf and all attachments thereon (OCS)." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1886 (2019). As such, "[f]ederal law governs actions brought under OCSLA, unless there is a gap in the federal law, wherein the law of the adjacent state will be used as surrogate federal law." *Total E & P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*, 389 F. Supp. 3d 478, 482 (S.D. Tex. 2018) (internal quotations omitted) (quoting *Danos & Curole Marine Contractors, Inc. v. BP Am. Prod. Co.*, 61 F. Supp. 3d 679, 683 (S.D. Tex. 2014)). It is undisputed that Louisiana is the adjacent state in the instant case and that Louisiana law is not inconsistent with federal law. ECF No. 75 at 11; ECF No. 77 at 11; ECF No. 79 at 12; ECF No. 81 at 16. As such, Louisiana law applies to any gaps in federal law.

## III. Analysis

Corporate Defendants set forth three grounds to support their respective motions for summary judgment. ECF Nos. 75, 77, 79. First, Corporate Defendants argue that Louisiana and federal

law do not entitle Lexon to be subrogated to the rights of the United States as against the Corporate Defendants under the facts and circumstances of this case. ECF No. 75 at 11–20; ECF No. 77 at 11–21; ECF No. 79 at 13–23. Second, Corporate Defendants argue that Lexon cannot recover on the basis of contribution because Lexon has no greater rights against them than Linder Oil had, and Linder Oil agreed to indemnify the Corporate Defendants for any decommissioning obligations it owed the United States. ECF No. 75 at 21–22; ECF No. 77 at 21–23; ECF No. 79 at 23–24. Third, Corporate Defendants argue that Lexon cannot recover based on theories of unjust enrichment or equitable subordination because Corporate Defendants have not received an unjust benefit. ECF No. 75 at 22–23; ECF No. 77 at 23–24; ECF No. 79 at 24–25.

Conversely, Lexon sets forth two grounds to support its motion for summary judgment. ECF No. 81. Lexon claims it is subordinated to all rights that the United States has against the Corporate Defendants, including for recovery of the costs to decommission the equipment on the lease. Second, Lexon argues it is entitled to partial summary judgment against the Individual Indemnitors under the Indemnity Agreement. *Id.* at 15–25.

### A. Subrogation

The parties agree that Linder Oil owed the United States the duty to decommission its wells and other equipment upon termination of the Lease and the ROW. The Corporate Defendants agree that, upon Linder Oil's failure to perform its decommissioning obligations, they owed the United States the obligation to decommission the wells in Linder Oil's stead. The parties further agree that Lexon, as surety who paid the United States on the Bonds, is subrogated to the United States' rights as against Linder Oil. That is, there appears to be no disagreement that Lexon stepped into the United States' shoes vis-à-vis Linder Oil. The parties' disagreement centers around whether Lexon also

7

steps into the United States' shoes vis-à-vis the Corporate Defendants. Lexon argues that once it paid the United States on the Bonds, it obtained all the rights the United States had to obtain payment from all entities that owed the United States any decommissioning obligation on the Lease and ROW. The Corporate Defendants argue that the law does not allow recovery against them because their obligation to decommission was triggered only by Linder Oil's failure, and thus their obligations to the United States are secondary to Linder Oil's. The Corporate Defendants argue that they are essentially in the position of a sub-surety and that Lexon cannot recover from them because their obligation to the United States is secondary to Lexon's.

### 1. Equitable Subrogation Under Louisiana Law

Corporate Defendants argue that Lexon is not entitled to equitable subrogation because equitable subrogation is not recognized under Louisiana law. ECF No. 75 at 11–12; ECF No. 77 at 12; ECF No. 79 at 13. "[T]he common-law theory of equitable subrogation does not exist in Louisiana." *Soc'y of Roman Cath. Church of Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.*, 126 F.3d 727, 743 (5th Cir. 1997) (citing *Inst. of London Underwriters v. First Horizon Ins. Co.*, 972 F.2d 125, 127 (5th Cir. 1992)). Because Louisiana does not recognize equitable subrogation, Lexon is not entitled to relief based on equitable subrogation under Louisiana law.

### 2. Conventional and Legal Subrogation Under Louisiana Law

Louisiana law recognizes conventional subrogation (i.e., subrogation by contract) and legal subrogation (i.e., subrogation specifically recognized by the Civil Code). *Soc'y of Roman Cath. Church of Diocese of Lafayette, Inc.*, 126 F.3d at 743 (citing *Inst. of London Underwriters*, 972 F.2d at 127). "Conventional subrogation contemplates the obligee's consent and affirmative action to

8

transfer his rights; it takes place by virtue of an agreement whereby the obligee transfers his rights in a debt to a third person." *Gilbert v. Gottsegen*, 14-593 (La. App. 5 Cir. 5/21/15), 171 So. 3d 289, 296, *writ denied*, 2015-1406 (La. 10/2/15), 178 So. 3d 993. Here, there is no evidence of conventional subrogation because the United States, as obligee, did not transfer its rights by an agreement or contract to Lexon. As such, Lexon cannot seek conventional subrogation.

The court turns to legal subrogation. Article 3048 of the Louisiana Civil Code—found in Title XVI, which covers Suretyship—states, "The surety who pays the principal obligation is subrogated by operation of law to the rights of the creditor." LA. CIV. CODE art. 3048. Article 3048 does not specify *which* of the creditor's rights the surety is subrogated to and Title XVI does not define subrogation by operation of law. Lexon appears to believe this section means that the surety is subrogated to "all" of the creditor's rights. The next Code section in the same Title is relevant but does not directly answer the question. "A surety who pays the creditor is entitled to reimbursement from the principal obligor," and "A surety for multiple solidary obligors may recover from them reimbursement of the whole amount he has paid the creditor." LA. CIV. CODE art. 3049. Thus, the surety certainly has the creditor's full rights against the principal obligor(s), i.e. here Lexon has all the United States' rights as against Linder Oil. But neither of the cited Articles delineates the extent to which the surety has the obligee/creditor's rights against parties other than the principal obligor.

Article 1829 of the Civil Code—found in Chapter 4 of Title III, which governs subrogation generally—delineates the circumstances in which subrogation occurs by operation of law:

(1) In favor of an obligee who pays another obligee whose right is preferred to his because of a privilege, pledge, or mortgage;

(2) In favor of a purchaser of movable or immovable property who uses the purchase money to pay creditors holding any privilege, pledge, or mortgage on the property;

*(3) In favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment;*

(4) In favor of an heir with benefit of inventory who pays debts of the estate with his own funds; and

(5) In the other cases provided by law.

LA. CIV. CODE art. 1829 (emphasis added).

Relevant here is the emphasized third situation. The court reads Article 1829(3) to allow the surety in Lexon's shoes to seek payment from others, such as the Corporate Defendants, who also owe the debt it secured, but only if Lexon has a right against those others "as a result of the payment." Assuming Lexon and the Corporate Defendants' mutual obligations to the United States satisfy the first clause of Article 1829(3), there is no evidence in this case that any agreement or understanding existed either between Lexon and the United States or between Lexon and Linder Oil that would trigger a right of recovery by Lexon against the Corporate Defendants "as a result of" Lexon's payment under the Bonds. In fact, the opposite is true. Linder Oil had, by the time Lexon issued the Bonds, agreed to indemnify the Corporate Defendants for any decommissioning obligations they might owe the United States.

Lexon argues that because Louisiana Civil Code Article 3048 does not specifically limit the scope of the obligee's rights to which the surety is subrogated, the surety is subrogated to all of the obligee's rights. That is, Lexon argues it has all of the United

10

States' rights to recover from any person who owes decommissioning obligations to the United States under the lease. Lexon does not cite, and the court has not found, any authority supporting such a broad reading of the law. Moreover, as discussed, Article 1829(3)'s "and who has recourse against those others" clause suggests that there is a limit on the surety's rights against those other than the obligor it secured. If it were the law that a surety attains all the rights of the creditor upon default by the obligor, the phrase "and who has recourse against those others" would be superfluous. The court declines to read Article 3048 in a way that would render other sections of the Civil Code meaningless.

The Restatement (Third) of Suretyship & Guaranty (1996) (the Restatement) also provides useful guidance here. "Although the Restatement is not binding on Louisiana courts, the restrictions and guidelines established therein for policy reasons do provide guidance to [Louisiana's] courts in the adjudication of these claims." *Nicholas v. Allstate Ins. Co.*, 765 So. 2d 1017, 1021 n.4 (La. 2000) (applying the Restatement (Second) of Torts); *see also Glob. Int'l Marine, Inc. v. US United Ocean Servs., LLC*, No. CIV. A. 09-6233, 2011 WL 2550624, *11 (E.D. La. June 27, 2011) (relying the Restatement § 18 cmt. a in deciding a subrogation issue under Louisiana law).

The Restatement is consistent with the court's reading of the Louisiana Civil Code. According to the Restatement, when "the secondary obligor is subrogated to the rights of the obligee, the secondary obligor may enforce, for its benefit, the rights of the obligee as though the underlying obligation had not been satisfied" in four instances. Restatement § 28(1). These instances are:

(a) against the principal obligor pursuant to the underlying obligation;

(b) against any other secondary obligor for the same underlying obligation, unless the other secondary obligor is a subsurety for the subrogated secondary obligor;

(c) against any interest in property securing either the obligation of the principal obligor or that of any other secondary obligor against whom the rights of the obligee may be enforced; and

(d) against any other persons whose conduct has made them liable to the obligee with respect to the default on the underlying obligation.

*Id.*

Subsections (b) and (d) are relevant here. Restatement § 28(1)(d) allows for a surety (such as Lexon) to be subrogated to the rights of an obligee (such as the United States) "against any other persons [such as the Corporate Defendants] whose conduct has made them liable to the obligee with respect to the default on the underlying obligation." The court reads this section to mean that the Corporate Defendants' liability to Lexon would only be triggered if they had some hand in Linder Oil's default.[3] Otherwise, subsection (d) could simply read "against any other person liable to the obligee on the underlying obligation." Here, there is no evidence that Corporate Defendants did anything to cause Linder Oil's default.

---

[3] An example of this is found in *Lyndon Prop. Ins. Co. v. Duke Levy & Assocs., LLC*, 475 F.3d 268, 270–71 (5th Cir. 2007). In *Lyndon* a utility district contracted to construct a sewage collection system. *Id.* at 270. Lyndon Property Insurance Company (Lyndon) acted as surety for the builder. *Id.* The district contracted with Duke Levy and Associates (DLA) for engineering and inspection services. *Id.* The district terminated the builder for performance reasons and Lyndon was required to fund the completion of the project. *Id.* The court held that Lyndon was subrogated to the rights of the district against DLA for DLA's negligent failure to properly inspect and approve the builder's work. The court's rationale is consistent with Restatement § 28(1)(d). Because DLA contributed to the default, Lyndon was permitted to assert the district's rights against DLA via subrogation.

Restatement § 28(1)(b) also does not help Lexon. That section allows for a secondary obligor to be subrogated to the rights of an obligee "against any other secondary obligor for the same underlying obligation, unless the other secondary obligor is a sub-surety for the subrogated secondary obligor." *Id.* Lexon argues that the Corporate Defendants are primary co-obligors, and, as such, Lexon can recover its losses from the Corporate Defendants. ECF No. 81 at 23–24. The court disagrees. Restatement § 53 defines the distinction between co-suretyship and sub-suretyship. Restatement § 53(3) states,

> in the absence of an agreement between or among them, secondary obligors for the same underlying obligation are cosureties unless a subsuretyship relationship is established by circumstances that demonstrate that, as between themselves, one secondary obligor (the "principal surety") rather than the other (the "subsurety") should perform or bear the cost of performance.

The circumstances of this case strongly suggest that the Corporate Defendants are analogous to sub-sureties with respect to Lexon. Under 30 C.F.R. § 556.710, the Corporate Defendants' duty to decommission the equipment on the lease was triggered only upon Linder Oil's default. The regulation states in part "BOEM or BSEE may require you to bring the lease into compliance *if your assignee or any subsequent assignee fails to perform* any obligation under the lease . . . ." 30 C.F.R. § 556.710 (emphasis added). Moreover, when Lexon issued the Bonds, Linder Oil had already agreed to indemnify the Corporate Defendants for any decommissioning obligations. Lexon's Bonds only secured Linder Oil's performance. Thus, the circumstances clearly demonstrate that the Corporate Defendants' duties were triggered only when Linder Oil defaulted. Lexon, as surety, had the duty to

perform upon Linder Oil's default. Lexon had the primary duty to perform Linder Oil's obligations.

Under the Restatement, when the relationship between two sureties is that of sub-suretyship, the principal occupies the position of the principal obligor and the sub-surety occupies the position of a secondary obligor. Restatement § 59. The principal obligor has the duty to perform. Restatement § 21(1). The sub-surety has rights of contribution against the principal surety, not the other way around. Restatement § 55.

The single reported case to deal with this issue takes the same view. In circumstances materially indistinguishable from this case, Bankruptcy Judge Isgur found that the surety had no cause of action for subrogation against the leaseholder's predecessor-in-interest, even though the predecessor-in-interest still owed decommissioning duties to the United States. *In re Tri-Union Dev. Corp.*, No. 03–44908, 2012 WL 3821870 (Bankr. S.D. Tex. Sept. 3, 2012) ("*Tri-Union II*"). Lexon does not cite any factually similar cases coming to a different conclusion.

The court concludes that legal subrogation under Louisiana law does not permit Lexon to recover from the Corporate Defendants under the facts of this case.

### 3. Statutory Subrogation Based on 31 U.S.C. § 9309

Lexon argues that a surety's right of subrogation has been codified by 31 U.S.C. § 9309, which provides:

> When a person required to provide a surety bond given to the United States Government is insolvent or dies having assets insufficient to pay debts, the surety, or the executor, administrator, or assignee of the surety paying the Government the amount due under the bond--(1) has the same priority to amounts from the assets and estate of the person as are secured for the Government; and (2) personally may bring a civil action under the bond to recover amounts paid under the bond.

14

Corporate Defendants argue that Lexon's statutory subrogation claim fails because the statute has no bearing on subrogation as to anyone other than a surety's principal. ECF No. 79 at 12; ECF No. 77 at 12; ECF No. 79 at 13. The court agrees with the Corporate Defendants. As Judge Isgur put it, "Section 9309 does not implicitly exclude a surety from subrogation against third parties; it simply does not mention it." *Tri-Union II*, 2012 WL 3821870, at *12. Because the statute does not create a federal right of subrogation under the facts of this case, Lexon is left to rely on state law, which the court has explained does not provide Lexon an avenue of relief.

The court recommends that the Corporate Defendants' motion for summary judgment on Lexon's subrogation claim be granted, and that Lexon's motion for summary judgment on its claim for subrogation be denied.

### B. Contribution

Lexon seeks to recover from Corporate Defendants under a theory of contribution. ECF No. 1 ¶ 109. Lexon cites two Articles of the Louisiana Civil Code in support of its claim—Articles 1804 and 3055. Article 3055 states that "co-sureties are those who are sureties for the same obligation of the same obligor." Co-sureties "are presumed to share the burden of the principal obligation in proportion to their number," absent agreement to the contrary. LA. CIV. CODE art. 3055. Article 1804 states that "Among solidary obligors, each is liable for his virile portion." Under Article 1794, "An obligation is solidary for the obligors when each obligor is liable for the whole performance."

Lexon does not cite any cases applying these Code sections. The court reads these sections to allow contribution among co-sureties. The court has already found that, as between Lexon and the Corporate Defendants, the relationship is more akin to that of sub-surety. Under the Restatement, the principal surety bears the

15

burden of performance. Restatement § 21(1)(a). The sub-surety has rights, including contribution, from the principal surety in the event the principal surety fails to perform. Restatement §§ 21(2), 55(2). Lexon does not present any legal theory under which it has a right of contribution. To the extent that Lexon seeks to step into Linder Oil's shoes to seek contribution from Linder Oil's predecessors-in-interest, as discussed above, Lexon cannot recover from the Corporate Defendants in Linder Oil's stead because Linder Oil indemnified the Corporate Defendants.

The court recommends that summary judgment be granted in favor of Corporate Defendants on Lexon's contribution claim. The court recommends that Lexon's motion for summary judgment on its contribution claim be denied.

### C. Unjust Enrichment or Equitable Subordination

Corporate Defendants argue that Lexon cannot recover based on a theory of unjust enrichment or equitable subordination[4] because Linder Oil "agreed to fully satisfy all abandonment obligations and to indemnify" Chevron and Sojitz for decommissioning obligations and because Lexon agreed to pay for decommissioning obligations upon default by Linder Oil. ECF No. 75 at 22–23; ECF No. 77 at 23–24; ECF No. 79 at 24–25. BP argues that "Chevron's indemnity obligations to predecessors extend up

---

[4] Equitable subordination is a remedy in a bankruptcy proceeding that is warranted when there is "(1) fraud, illegality or breach of fiduciary duties; (2) undercapitalization; and (3) a claimant's use of the debtor as a mere instrumentality or alter ego." *Matter of Clark Pipe & Supply Co.*, 893 F.2d 693, 699 (5th Cir. 1990). The instant case is not a bankruptcy proceeding, and Lexon has not set forth facts to support any of the elements of equitable subordination. Additionally, Lexon has abandoned the equitable subordination claim by failing to address equitable subordination in its response (ECF No. 89) to Sojitz's Motion for Summary Judgment (ECF No. 79). *See Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022) ("A plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims.") (internal citations omitted).

the chain of title to" BP. ECF No. 77 at 24. Lexon argues[5] that the
Corporate Defendants would be unjustly enriched if permitted to
keep the funds paid by Lexon for decommissioning. ECF No. 89 at
19. Again, neither side cites any relevant cases to aid the court in
its analysis.

"A person who has been enriched without cause at the
expense of another person is bound to compensate that person."
LA. CIV. CODE art. 2298. Under Louisiana law, a plaintiff must
show the following to establish unjust enrichment:

> (1) there must be an enrichment; (2) there must be an
> impoverishment; (3) there must be a connection
> between the enrichment and the resulting
> impoverishment; (4) there must be an absence of
> 'justification' or 'cause' for the enrichment and
> impoverishment; and (5) there must be no other
> remedy at law available to the plaintiff.

*JP Mack Indus. LLC v. Mosaic Fertilizer, LLC*, 970 F. Supp. 2d
516, 520–21 (E.D. La. 2013) (citing *Carriere v. Bank of La.*,
(La.12/13/96) 702 So.2d 648, 671). "[I]f there is a contract between
the parties it serves as a legal cause, an explanation, for the
enrichment. '[O]nly the unjust enrichment for which there is no
justification in law or contract allows equity a role in the
adjudication.'" *Edwards v. Conforto*, 636 So. 2d 901, 907 (La. 1993),

---

[5] Lexon also argues that Sojitz is responsible for paying $2.7 million for
decommissioning obligations under an agreement with Linder Oil, Destin, and
Reserves, provided that Linder Oil submit an Authorization for Expenditure (AFE).
ECF No. 89 at 20. It is undisputed that Linder Oil never undertook any
decommissioning activity and that an AFE was never submitted. *Id.* at 20–21; ECF
No. 95 at 15. Lexon further claims that Linder Oil was excused from meeting the
condition of submitting an AFE because Linder Oil "filed for bankruptcy before it
could undertake any decommissioning activities." ECF No. 89 at 21. The argument is
entirely speculative. Moreover, Linder Oil undertook no decommissioning activity,
and an AFE was not submitted. Sojitz's contractual duty to pay was not triggered.
For the reasons discussed above, this is not an enrichment without contractual cause.

*on reh'g* (May 23, 1994) (quoting *Edmonston v. A–Second Mortg. Co. of Slidell*, 289 So.2d 116, 122 (La.1974)).

Here, Lexon issued the Bonds to secure Linder Oil's Lease and ROW obligations, including decommissioning obligations. ECF No. 74 ¶¶ 36–38; ECF No. 75–13. Lexon was contractually bound to pay on the Bonds upon Linder Oil's default. Moreover, Linder Oil had, years before the bonds were issued, agreed to indemnify Chevron and its successors for their decommissioning obligations. Lexon's payment of the Bonds to the United States is exactly what was supposed to happen in the event of Linder Oil's default. To the extent that the Corporate Defendants have been enriched, there is justification in contract for the enrichment, and Lexon's claim for unjust enrichment fails. *Edwards*, 636 So. 2d at 907 ("The justification or cause for the lessor's enrichment was the contractual agreement between the parties.").

It is also not clear to the court that the Corporate Defendants have been enriched. The Corporate Defendants remained liable to the United States to perform Linder Oil's decommissioning obligations. The BOEM and BSEE entered into an agreement with Sojitz and Chevron pursuant to which BOEM would provide the forfeited bond funds to Sojitz, and Sojitz would conduct the decommissioning work. ECF No. 79 at 11. Sojitz incurred $13,641,844.68 in costs to complete the decommissioning obligations. *Id.* The Corporate Defendants are in no better a position as they would have occupied had Linder Oil not defaulted.

The court recommends that summary judgment be granted in favor of Corporate Defendants on Lexon's claim for unjust enrichment.

### D. The Individual Indemnitors' Liability Under the Indemnity Agreements

Lexon seeks partial summary judgment against the Individual Indemnitors on its fifth cause of action—breach of

18

contract. ECF No. 81 at 24. The Individual Indemnitors jointly oppose Lexon's partial motion for summary judgment. ECF No. 90. The Individual Indemnitors argue that genuine issues of material fact exist as to: (1) whether the Individual Indemnitors signed the Indemnity Agreement in their individual capacities; (2) which Indemnity Agreement is effective; (3) whether failure to execute the Indemnity Agreement prior to issuance of the Bonds invalidates the Bonds; and (4) whether the Indemnity Agreement is authentic. *Id.* at 4–7.

### 1. Factual Background

The timeline of events leading to the execution of the Indemnity Agreement is critical to understanding the parties' arguments. Stephen Scott Sewell (Sewell) brokered the surety Bonds for Linder Oil. ECF No. 81-39 ¶ 4. Lexon required that Mr. Linder and Mr. Biggs execute an indemnity agreement both on behalf of Linder Oil, Destin, and Reserves, as well as in their individual capacities. *Id.* ¶ 7. Sewell communicated with both Mr. Linder and Mr. Biggs about their obligation to personally indemnify Lexon. *Id.* ¶ 8. On March 29, 2016, Sewell went to Mr. Linder and Mr. Biggs' offices to obtain signatures on the indemnity agreement. That earlier signed indemnity agreement was dated effective March 29, 2016. *Id.* ¶ 10; ECF No. 81-42. It turned out that the signatures on that agreement were not in the correct places and were not properly witnessed, so that version of the agreement could not be submitted to Lexon. ECF No. 81-39 ¶ 11.

The version of the agreement that was submitted to Lexon is dated March 25, 2016. ECF No. 81-39 ¶ 14. Sewell witnessed Mr. Linder and Mr. Biggs sign the agreement. Both Mr. Linder and Mr. Biggs agree that their signatures appear on the agreement under the heading "Individual Indemnitors." *See* ECF No. 81-33 at 3 (Mr. Linder's deposition testimony); ECF No. 81-34 at 1–2 (Mr. Biggs' deposition testimony). The final version of the agreement

that was submitted to Lexon is attached as an exhibit to Sewell's declaration. ECF No. 81-43. It is also attached as an exhibit to Lexon's motion for summary judgment with a "Received" stamp in the top right-hand corner. ECF No. 81-37.

### 2. Signatory Capacity of the Individual Indemnitors

The Individual Indemnitors argue that the version of the agreement that was first signed, but which has the later date, ECF No. 81-36, is the version of the agreement that is binding if any agreement is binding at all. According to the Individual Indemnitors, because that earlier signed agreement does not have Mr. Linder's and Mr. Biggs' signatures under the heading "Individual Indemnitors," they are not bound individually.

There are two problems with this argument. First, the earlier version of the agreement shows both Mr. Linder's and Mr. Biggs' signatures above both their individual names as well as above the names of their companies. ECF No. 81-36 at 5; *cf. Hohensee v. Turner*, 2013-0615 (La. App. 4 Cir. 1/22/14), 133 So. 3d 141, 143 (holding that individuals signed in their individual capacities and not as members of an LLC because the signature lines did not indicate that they were signing as members, but rather only included their signatures).

Moreover, the facts above demonstrate that both Individual Indemnitors intended to be bound in their individual capacity and signed a final version of the agreement in their individual capacity. Although the Individual Indemnitors do not concede that they are individually bound, the unrebutted summary judgment evidence shows that they did sign the final agreement that was submitted to Lexon in their individual capacities. A mere refusal to concede an issue does not raise a fact issue.

20

### 3. Integration Clause

The Individual Indemnitors argue that the final version of the Indemnity Agreement, ECF Nos. 81-37, 81-43, is not enforceable because it contains an integration clause which states that no other agreements between the parties exist that would "in any way lessen our obligations as set forth [in the agreement]." *See* ECF No. 81-37 at 5. The Individual Indemnitors appear to argue that the earlier signed agreement does not bind them individually and that the integration clause in the final agreement precludes any alteration of the earlier agreement. The court disagrees.

First, as discussed, the earlier signed agreement clearly shows both Mr. Linder and Mr. Biggs signed in their individual capacities. Second, the clause at issue means what it says. There are no other agreements that would in any way lessen the Individual Indemnitors' obligations as set forth in the final version of the agreement. They are bound by the final version of the agreement they signed and which Sewell submitted to Lexon— ECF No. 81-37.

### 4. Suspensive Condition

The Individual Indemnitors argue that the Bonds are not effective because the Indemnity Agreement states that indemnity is a condition precedent to issuance of the Bonds, but that the Bonds were issued before the Indemnity Agreement was signed. The language the Individual Indemnitors rely on is found in a "whereas" clause at the beginning of the Indemnity Agreement, which states, "as a prerequisite to the execution of such Bond or Bonds, the Surety requires complete indemnification." ECF No. 81-37 at 1. Individual Indemnitors also cite Sewell's Declaration in which he states "[t]here was no specific importance to the effective date, other than the agreement was to be signed before the

issuance of bonding."[6] ECF No. 81-39 ¶ 15. Lexon counters that the Individual Indemnitors agreed to indemnify Lexon against all liability arising from any Bonds issued before or after the execution of the Indemnity Agreement. ECF No. 94 at 16.

There is no disagreement that the Bonds were issued on March 23, 2016, and March 25, 2016, and that the final version of the indemnity agreement was signed thereafter and made effective as of March 25, 2016. The question is whether the introductory statement in a "whereas" clause *in an indemnity agreement* indicating that indemnity is a prerequisite to issuance of the Bonds can invalidate the Bonds themselves. The court concludes that it cannot.

First, the court finds that the clause in question does not set out any contractual obligations of the parties. It merely sets out the parties' reasons for entering into the contract. The plain language of the contract is in accord with Louisiana law. A contract with introductory paragraphs commencing with the word "whereas" "simply means 'when in fact', 'considering that', 'because', [or] 'by reason of.'" *Succession of Ramp*, 252 La. 660, 671 (1968). "The clauses of a contract which begin with the word 'whereas' simply state the reasons for the confection and the mental intent of the parties." *Id.* "That portion of a contract which follows the word 'therefore' is simply the response to the reasoning and the mental intention of the parties." *Id.* The premises set out in the "whereas" clause are not binding promises between the parties. *Cf. McCary v. Oceaneering Int'l, Inc.*, 2017-1163 (La. App. 1 Cir. 2/27/18), 243 So. 3d 613, 616–17.

---

[6] Because the Indemnity Agreement is not ambiguous, the court need not consider Sewell's Declaration. *See Cenac v. Orkin, L.L.C.*, 941 F.3d 182, 190 (5th Cir. 2019) ("If the text is clear and unambiguous, the court may not go beyond the text for further interpretation.").

Moreover, the Indemnity Agreement contains language indicating that it contemplates that bonds may be issued before its execution. Even the "whereas" clause itself contains such language. It begins with "WHEREAS, in the transaction of business, certain Bonds, undertakings and other writings obligatory in the nature of a Bond have *heretofore been*, and/or may hereafter be, required . . . ." ECF No. 81-43 at 1 (emphasis added). The next paragraph indicates that the Indemnity Agreement is not only required for the future issuance of bonds but also to prevent the cancellation of bonds already issued. It states in part "NOW, THEREFORE, in consideration of the premises, the execution and delivery of one or more Bonds, or *its refraining from attempting to cancel the same by the Surety* [the parties agree as follows]." *Id.* (emphasis added). In a paragraph titled "SURETYSHIP COVERED," the agreement states that "The Indemnitors hereby acknowledge that this Agreement is intended to cover any bonds . . . *heretofore or hereafter* executed by the Surety on behalf of the Indemnitors." *Id.* at 4.

The court concludes that the Indemnity Agreement clearly covers bonds that may have been issued before its execution. The fact that it was executed prior to issuance of the Bonds does not invalidate the Bonds.

### 5. Authenticity of the Indemnity Agreement

Individual Indemnitors argue that Lexon has failed to authenticate the Indemnity Agreement. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). The standard for authentication is low. *Weinhoffer v. Davie Shoring, Inc.*, 23 F.4th 579, 582 (5th Cir. 2022). Rule 901 of the Federal Rules of Evidence "merely requires some evidence which is sufficient to support a finding that the evidence in

question is what its proponent claims it to be." *In re McLain*, 516 F.3d 301, 308 (5th Cir. 2008). Submission of a declaration satisfies the authentication requirement where the declarant has personal knowledge of the facts set out in the declaration. *Crear v. Select Portfolio Servicing Inc.*, 760 F. App'x 291, 295 (5th Cir. 2019).

Here, Lexon produced the declaration of Sewell, in which Sewell authenticated the Indemnity Agreement by attaching a copy of it to his declaration and stating that he witnessed both Mr. Linder's and Mr. Biggs' signatures.

The Individual Indemnitors are bound by a valid indemnification agreement. The agreement requires the Individual Indemnitors to indemnify Lexon for any liability it may incur by reason of having executed the Bonds. There is no dispute that Lexon has suffered losses and damage by having paid the Bonds to the United States. Lexon's motion for summary judgment against the Individual Indemnitors should be granted.

### III. CONCLUSION

The court recommends that Lexon's Motion for Summary Judgment Against Corporate Defendants, ECF No. 81, be **DENIED**, that Lexon's Partial Motion for Summary Judgment Against Individual Defendants, ECF No. 81, be **GRANTED,** and that Corporate Defendants' Motions for Summary Judgment, ECF Nos. 75, 77, 79, be **GRANTED**.

The parties have fourteen days from service of this Memorandum and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas on February 28, 2024.

Peter Bray
United States Magistrate Judge